Breese, Justice, delivered the opinion of the court: Whitney, the appellee here, filed his bill in chancery in the Sangamon circuit court, praying that the appellants, the two first named being the agents of the fund commissioner of the state, and the others the contractors under him, might be enjoined and restrained from constructing or having constructed any turnout or depot at any other place in or near Springfield, on the Northern Cross railroad, except on lot eight (8) in block eight (8), lots eight (8) and nine (9) in block five (5), lots nine (9), ten (10), eleven (11), and twelve (12), in block two (2), in Whitney’s addition to the town, now city, of .Springfield; the appellee basing his right thus to restrain them, on an act passed at the last session of the general assembly, entitled, “¿m act authorizing the mutual conveyance of certain lots by and between the auditor of public accounts and J. 'Whitney ” (Laws'of 1841, 309), approved February 27, 1841. The injunction was allowed in vacation, and at the last [* 62] November term, the defendants entered their motion to dissolve it, which was overruled. On the thirtieth of November thereafter, E. D. Taylor, one of the defendants, put in his answer to the bill, and then moved to dissolve the injunction, which was also denied. By agreement of the parties, without prejudice to either in this court, the injunction was made perpetual, and the costs taxed against the defendants, who bring' the cause here, on appeal, and assign as error, the several refusals of the court to dissolve the injunction, on motions made before and after the answer, and in entering a final decree making the injunction perpetual. It is not necessary, in order to understand the merits of this controversy, to state the various allegations in the bill and answer, or the many facts agreed by the parties as.forming a part of the record in the cause. It is sufficient merely to examine the acts of the legislature referred to in the bill of complaint, to determine the rights of the parties before the court, together with one or two sections of the “ act to establish and maintain a general system of internal improvements,” (Acts of 1837, 121,) approved February 27th, 1837. By the ninth clause of the loth section of the last named act, the Northern Cross railroad was projected from Quincy on the Mississippi river, by Meredosia, on the Illinois river, Jacksonville, and Springfield, to the State Line, in the direction of Lafayette, in Indiana, crossing the Sangamo river at some eligible point below its north and south forks. The acceptance of donations of land from individuals, companies, corporations, or the general government, was authorized, to aid in carrying on the work, and also grants and releases from individuals of such plats of ground as shall be deemed necessary for depots and stopping stages at the ends and along the routes of the said railways.” One track only was provided for, with the necessary turnouts and side tracks, at convenient points for stopping stages and depots along the lines, not less than five-miles, nor more than fifteen miles asunder, and also at the intersection of navigable rivers, and at the commencing and terminating points of the several lines of railroads. The whole system of internal improvements was suspended by the act of February 1,1840, (Laws of 1840, 93,) at which time a small portion only of the Northern Cross railroad was completed, namely, that part of it between Meredosia and Jacksonville, and remained so until the last session of the general assembly. At this session, a law was passed, approved February 26th, 1841, 194, providing for the completion of that part of the road from Jacksonville to Springfield. One hundred thousand dollars in canal bonds was appropriated for that purpose, and the fund commissioner authorized to enter into a contract with some person or persons, to complete it in one year. On the next day, the 27th day of February, an act was passed, giving in charge to that officer, ail that part of the Northern Cross railroad [* 63] situate between Springfield and the Illinois river, and requiring him to give public notice of the time, place, and terms of letting the contract, before any part of it should be put under contract. It was at this session that the act was passed, under which the appellee claims the interference of the court. The preamble of it recites, that he had conveyed by deed of gift to the state, certain lots in his addition to Springfield, for the purpose of locating the turnout, depot, etc., of this road on them; that a change had been made in the turnout, by the principal engineer, since the donation, whereby it became necessary to make the location on lots (naming them, being the same as set out and described in the appellee’s bill of complaint), instead of the lots donated, and that it was expedient that the state should obtain the last named lots by surrendering the former. The act then declares, that the auditor of public accounts shall be authorized and required to convey to Jonas Whitney, the lots before donated by him, so soon as Whitney shall convey to the state the lots above described, “ to be used by the said state for the said turnout depot on the Northern Cross railroad.” By the facts agreed to, it appears that the fund commissioner did give public notice of the letting of the road from Jacksonville to Springfield, and'on the twenty-fourth of March, 1841, the defendant Duff and the others entered into the contract, specifying in it that they are to‘ complete the road from Jacksonville to the end of the second division, and to make two turnouts and no depot, and to finish the road in one year thereafter. It is also admitted, that the northern end of this second division is some hundred feet south of any of the lots donated or owned by the appellee, and that they are constructing there a turnout or turning table. These acts, passed in February, 1841, gave to the fund commissioner full power over this road, from Springfield to the Illinois river, and in completing it from Jacksonville to the first named place, he was not restricted to any point in or near Springfield, as the point of termination; that was left to hisjudgment. He might have proposed to construct it to the lots of the ap-pellee, designated under the original location and surveys, as the place for the depot; but he did not. The contract was taken to a point short of the projected 'depot, and there is nothing in any of the acts, from that establishing the system in 1837, down to those passed in 1841, which can be so construed as to impose an obligation on the state, by accepting donations for depots, etc., to carry out any part of the system according to the original design. After donations are accepted, of themselves of but little value, a more eligible route for the road, or for the location of the depot, turnouts, etc., may be obtained, by which a [* 64] large amount of expenditure would be saved; yet, the state could not take a course to save it, if the views of the appellee be correct. They would be bound by their acceptance of the gift to use it at whatever expense it might be to the state to fit it for use. We can regard the act authorizing the donation and its acceptance as no more than a declaration by the state to this effect: That if it should be deemed advantageous to the public interests to make a turnout and depot at the place designated, they shall be placpd on the lots donated; they shall be used for that purpose, whenever it becomes necessary to use them; and in the happening of this contingencjq the appellee might not be benefit-ted, as the owner of the adjacent lots. The state, in its discretion, has determined to complete only a small part of the road, and not to extend that part to the contemplated depot. The contract is taken to complete it, and we can see no objection to the authorities of the state, under whom Duff and the others are acting, to make the point at which the contract terminates profitable and advantageous for trade and transportation, by constructing turnouts and turning tables. No obligation rests upon the state, by any law, to establish •these works on the lots granted,, or at any other particular place. 'The interests of the public may not require them, and the principle is inadmissible that the state should be hampered, or her policy ■•controlled by any such donations. If the lots are not used by . the state, no doubt a reconveyance of them could be enforced. The decree of the circuit court, making the injunction perpetual, is reversed, and the injunction dissolved at the costs of the .•appellee. Decree reversed.